IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No. 21-455 |
| ) | |
| v. ) | [UNDER SEAL] |
| ) | |
| FREDERICK CUSHMORE JR. ) | (18 U.S.C. § 371) |
| ) | |

# INFORMATION

The United States charges:

## Introduction

At all times material to this Information:

1. The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of influencing the foreign official, inducing the foreign official to take or omit certain acts, and securing an improper advantage in order to assist those classes of persons in obtaining or retaining business for, or directing business to, any person.

2. Company 1 was headquartered in the Western District of Pennsylvania. Company 1 mined, processed, and sold metallurgical coal to customers in the domestic and international steel industry. Company 1 operated mines in Pennsylvania and Maryland and conducted business in foreign markets, including, at various times, Egypt and Turkey. Company 1 was a "domestic concern," as that term is defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).

3. Al Nasr Company for Coke and Chemicals ("Al Nasr" or "NCCC") was an Egyptian state-owned and state-controlled entity. Al Nasr was a subsidiary of Metallurgical Industries Holding Company, which was owned and controlled by the Egyptian government. Al Nasr was an "instrumentality" of the Egyptian government and Al Nasr's officers and employees were "foreign officials," as those terms are used in the FCPA. 15 U.S.C. § 78dd-2(h)(2)(A).

4. Between in and around 2016 and in and around 2020, Al Nasr contracted with Company 1 to purchase coal. During that time, Company 1 shipped coal to Al Nasr in Egypt on approximately thirteen occasions. In total, Al Nasr paid Company 1 approximately $143 million in connection with these coal shipments. Company 1 earned millions of dollars in profits in connection with the sale of coal to Al Nasr.

5. Defendant FREDERICK CUSHMORE JR. ("CUSHMORE") was a U.S. citizen and resident of Ridgefield, Connecticut. Between in and around late 2016 and in and around October 2020, CUSHMORE was employed by Company 1 in various international sales positions, including Vice-President, Head of International Sales.

6. Beginning in and around early 2018, CUSHMORE was the principal point of contact between Company 1 and Al Nasr and was responsible for Company 1's business relationship with Al Nasr. Among other things, CUSHMORE negotiated the terms of Company 1's coal shipments to Al Nasr. CUSHMORE was a "domestic concern," an employee and agent of a "domestic concern," and a stockholder thereof acting on behalf of a "domestic concern," as those terms are used in the FCPA. 15 U.S.C. § 78dd-2(h)(1).

7. Executive A was a U.S. citizen and resident of Tennessee. Between in and around 2016 and in and around March 2018, Company 1 employed Executive A in various international sales positions. In and around late 2016, Executive A established Company 1's formal sales

relationship with Al Nasr and served in the role until CUSHMORE succeeded him as Company 1's primary point of contact with Al Nasr in and around early 2018. During the time Executive A managed Company 1's relationship with Al Nasr, Executive A participated in conversations with CUSHMORE and other senior Company 1 executives, including Executive B, regarding Company 1's business in Egypt with Al Nasr.

8. Executive B was a U.S. citizen and resident of Pennsylvania. Executive B was a senior executive at Company 1 and supervised CUSHMORE and Executive A. Executive A was a "domestic concern," and an employee and agent of a "domestic concern," as that term is defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1). Executive B was a "domestic concern," an employee and agent of a "domestic concern," and a stockholder thereof acting on behalf of a "domestic concern," as that term is defined in the FCPA. 15 U.S.C. § 78dd-2(h)(1).

9. Agent A was an Egyptian national who controlled and operated Company 2, a business entity based in Egypt. On behalf of Company 1, Executive A contracted with Agent A, through Company 2, to serve as Company 1's sales agent in Egypt. In this role, Agent A and Company 2 acted as an intermediary between Company 1 and Al Nasr to negotiate and secure Company 1's business with Al Nasr in Egypt. Company 1 paid Agent A commissions on each metric ton of coal that Company 1 sold to Al Nasr. After CUSHMORE assumed responsibility for Company 1's relationship with Al Nasr, CUSHMORE dealt directly with Agent A and Company 2 regarding Company 1's coal sales in Egypt.

10. Foreign Official A was an Egyptian national and a high-level executive at Al Nasr. Foreign Official A was a "foreign official" as that term is defined in the FCPA. 15 U.S.C. § 78dd-2(h)(2)(A).

## COUNT ONE

The United States further charges:

11. Paragraphs 1 through 10 are realleged and incorporated by reference as though fully set forth herein.

### The Conspiracy and Its Object

Beginning in and around late 2016 and continuing through in and around October 2020, in the Western District of Pennsylvania, and elsewhere, the defendant,

FREDERICK CUSHMORE JR.,

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Agent A, Executive A, and other persons known and unknown to the United States, to commit an offense against the United States, that is, being a domestic concern, an employee and agent of a domestic concern, and a stockholder thereof acting on behalf of a domestic concern, to willfully and corruptly make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (i) influencing an act and decision of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do an act in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence any act and decision of such government and agencies and instrumentalities, in order to assist CUSHMORE,

4

Company 1, and others in obtaining and retaining business for and with, and directing business to, CUSHMORE, Company 1, and its employees, agents and others, in violation of Title 15, United States Code, Section 78dd-2(a).

### Purpose of the Conspiracy

12. The purpose of the conspiracy was for CUSHMORE and his co-conspirators, acting for and on behalf of Company 1, to obtain and retain lucrative sales contracts with, and other business advantages from, Al Nasr by making corrupt bribe payments to Foreign Official A and other Egyptian government officials, through Agent A and Company 2.

### Manner and Means of the Conspiracy

13. It was a manner and means of the conspiracy that CUSHMORE and Executive A, among other co-conspirators, discussed, decided, and agreed that, in order to increase Company 1's international business, Company 1 would offer and pay bribes through Agent A to foreign officials at Al Nasr to secure lucrative coal business in Egypt.

14. It was a further manner and means of the conspiracy that CUSHMORE and Executive A, acting on behalf of Company 1, and with the knowledge of their co-conspirators, contracted to pay Agent A commissions, through Company 2, intending that a portion of such commissions would be used to pay bribes to foreign officials at Al Nasr, including, but not limited to, Foreign Official A.

15. It was a further manner and means of the conspiracy that CUSHMORE, Executive A, and Agent A identified the foreign officials at Al Nasr to bribe to ensure that Company 1 would secure and retain business with Al Nasr.

16. It was a further manner and means of the conspiracy that CUSHMORE, Executive A, and Agent A, among other co-conspirators, would refer to the foreign officials,

including, but not limited to, Foreign Official A, and other individuals in Egypt to whom Agent A offered and paid bribes on behalf of Company 1, as "the team."

17. It was a further manner and means of the conspiracy that CUSHMORE, Executive A, and Agent A used multiple means of communication—including SMS text messaging, encrypted messaging services, telephone conversations, e-mails, and in-person meetings—to discuss the details of the bribery scheme and the specifics of how much each member of "the team" would be paid in bribes.

18. It was a further manner and means of the conspiracy that CUSHMORE, Executive A, Agent A, and other co-conspirators understood and intended that a portion of the commissions that Company 1 paid to Agent A, through Company 2, would be passed on as bribes to foreign officials at Al Nasr, including Foreign Official A, in order to influence acts and decisions of such foreign officials in their official capacities, to induce such foreign officials to do and omit to do certain acts, to secure improper business advantages on behalf of Company 1 from Al Nasr, and to induce such foreign officials to use their influence to benefit Company 1's business, including, but not limited to, by:

   a. helping Company 1 obtain multiple coal contracts with Al Nasr between in and around 2017 and in and around 2020;

   b. helping Company 1 secure a long-term sales contract with Al Nasr for the sale of coal in and around January 2018; and

   c. providing CUSHMORE, Agent A, Executive A, and their co-conspirators with inside, non-public information about Company 1's competitors' bids to sell coal to Al Nasr.

19. It was a further manner and means of the conspiracy that CUSHMORE, Executive A, Executive B, and other co-conspirators caused Company 1 to use means and

instrumentalities of interstate commerce to make payments of more than approximately $4.8 million in commissions to Agent A, through Company 2, in connection with Company 1's sale of coal to Al Nasr, a portion of which was used to pay bribes to foreign officials at Al Nasr, including Foreign Official A.

20. It was a further manner and means of the conspiracy that CUSHMORE and Agent A referred to various Al Nasr foreign officials, including Foreign Official A, by their initials or other nicknames in order to conceal the officials' true identities and obscure the fact that such foreign officials were receiving bribe payments.

21. It was a further manner and means of the conspiracy that, in order to conceal the bribery scheme, CUSHMORE, Executive A, Agent A, and their co-conspirators emphasized the need to use encrypted messaging services—including WhatsApp—as well as personal, non-corporate email accounts to communicate, and such communications included the use of means and instrumentalities of interstate commerce.

### Overt Acts

22. In furtherance of the conspiracy and to achieve the object thereof, one or more conspirators committed or caused to be committed, in the Western District of Pennsylvania and elsewhere, at least one of the following overt acts, among others:

23. On or about November 14, 2016, Executive A sent an email to CUSHMORE, Executive B, and another Company 1 sales executive, in which Executive A discussed the possibility that Al Nasr would purchase coal from Company 1. In the email, Executive A stated, "When shipping to this destination there typically are a few that the agent has to take care of when cutting a deal."

24. In and around February 2017, Company 1 sent a shipment of coal to Al Nasr in Egypt.

25. On or about April 25, 2017, CUSHMORE instructed Executive A, via encrypted message, that "[w]e should do more on this [i.e., WhatsApp] since it's encrypted."

26. On or about May 7, 2017, Executive A sent CUSHMORE an encrypted WhatsApp message containing details of a bid that one of Company 1's competitors had submitted to Al Nasr in an effort to obtain a coal contract with Al Nasr. Executive A further stated that Executive A had obtained the bid information from Agent A and intended to share it with Executive B. Executive A did not intend to share the bid information with another Company 1 sales executive, however, because, according to Executive A, Agent A stated that the bid information was "top secret."

27. On or about May 8, 2017, CUSHMORE and Executive A exchanged encrypted WhatsApp messages about the departure of a high-level official at Al Nasr. Executive A stated, "he's on his way out, but since they are government it takes a while." Executive A also informed CUSHMORE that Agent A's "guy" was "likely going to" replace the departing high-level official.

28. On or about May 26, 2017, Executive A sent CUSHMORE an encrypted WhatsApp message stating, "Here is one of my text[s] to [Agent A]: If these thieves that work at NCCC want their share of the commission they will work with us on pricing." CUSHMORE replied, "Exactly."

29. In and around July 2017, Company 1 sent a shipment of coal to Al Nasr in Egypt.

30. In and around September 2017, Company 1 sent a shipment of coal to Al Nasr in Egypt.

31. On or about October 16, 2017, Agent A traveled to Pittsburgh, Pennsylvania, in the Western District of Pennsylvania, to meet with Executive A and Executive B to discuss Agent A and Company 2's business with Company 1 and Company 1's business with Al Nasr.

32. On or about October 17, 2017, Agent A executed, on behalf of Company 2, a five-year agency agreement with Company 1 stipulating that Company 2 would receive a targeted commission of $5 per metric ton of coal that Company 1 sold to Al Nasr.

33. In and around December 2017, Company 1 sent a shipment of coal to Al Nasr in Egypt.

34. In and around March 2018, CUSHMORE traveled to Egypt for meetings with Agent A and foreign officials at Al Nasr.

35. In and around April 2018, Company 1 sent a shipment of coal to Al Nasr in Egypt.

36. On or about April 27, 2018, Agent A sent CUSHMORE an encrypted WhatsApp message stating, "The high committee [at Al Nasr] consists of 9 persons. We have 3 inside only."

37. In and around June 2018, Company 1 sent a shipment of coal to Al Nasr in Egypt.

38. On or about June 12, 2018, Agent A sent CUSHMORE an encrypted WhatsApp message referring to the "secret info" that "the Com[mission] is divided over 4-5 persons."

39. On or about July 11, 2018, Agent A sent CUSHMORE an encrypted WhatsApp message stating that a particular Al Nasr foreign official was "the only one supporting 'for free.'"

40. In and around September 2018, Company 1 sent a shipment of coal to Al Nasr in Egypt.

41. In and around October 2018, CUSHMORE traveled to Egypt for meetings with Agent A and foreign officials at Al Nasr.

42. In and around December 2018, Company 1 sent shipments of coal to Al Nasr in Egypt.

43. In and around February 2019, Company 1 sent shipments of coal to Al Nasr in Egypt.

44. In and around March 2019, CUSHMORE and another Company 1 executive traveled to Egypt for meetings with Agent A and foreign officials at Al Nasr.

45. In and around May 2019, Company 1 sent shipments of coal to Al Nasr in Egypt.

46. In and around July 2019, Company 1 sent shipments of coal to Al Nasr in Egypt.

47. In and around October 2019, CUSHMORE traveled to Egypt for meetings with Agent A and foreign officials at Al Nasr, including Foreign Official A.

48. In and around December 2019, Company 1 sent shipments of coal to Al Nasr in Egypt.

49. In and around May 2020, Company 1 sent shipments of coal to Al Nasr in Egypt.

In violation of Title 18, United States Code, Section 371.

_____
STEPHEN R. KAUFMAN
Acting United States Attorney
PA ID No. 42108

_____
JOSEPH S. BEEMSTERBOER
Acting Chief
Fraud Section, Criminal Division
U.S. Department of Justice